CRIMES AND PUNISHMENTS ** Part I of Part II ** Presently, the State of Oklahoma possesses no jurisdiction to prosecute crimes and offenses defined by the Major Crimes Act, committed by Indian against Indian, upon trust allotment lands within the geographical boundaries of the State of Oklahoma so defined as "Indian Country." This is not to say, however, that state officers acting solely under color of state law do not possess the power to arrest Indian offenders for the commission of federal crimes defined under the Major Crimes Act when such offenders are found within the jurisdiction of the officers and not on "Indian Country." State officers may seek prosecution of an Indian offender by the U.S. Attorney; such prosecution must exclusively be had in the Federal courts. However, state jurisdiction over crimes committed by Indians would lie when an Indian trust allotment ceases to be land within "Indian Country" by the extinguishment of Indian title to such land through treaty or government patent to individuals, or the conveyance of such land to a non-Indian. Regarding the crimes not defined by the Major Crimes Act, or generally, misdemeanor crimes, it is clear that jurisdiction over these crimes is concurrently possessed by federal and Indian tribal courts. In the event that no judicial machinery exists under tribal constitution for the prosecution of misdemeanor crimes committed upon Indian Country by an Indian against another Indian, the federal government retains jurisdiction under the Assimilative Crimes Act. It is clear. then, that the State of Oklahoma is without jurisdiction to prosecute crimes committed upon Indian trust allotment lands defined as "Indian Country" when such crimes are committed by an Indian against another Indian. No prohibitions exist under Oklahoma law to sanction the acceptance by state and local officers of Deputy Special Officer Commissions from the United States Department of the Interior to allow their entrance upon Indian Country to assist federal law enforcement officials in the apprehension of criminals and the maintenance of law and order therein. The Attorney General has considered your request for an opinion wherein you ask, in effect, the following questions: 1. In the area formally known as Oklahoma Territory, what is the extent of State criminal jurisdiction over Indian vs. Indian crimes occurring upon Indian trust allotment land located therein? 2. If the answer to question one is that the State of Oklahoma is without jurisdiction, can state, county, and municipal law enforcement officers accept Deputy Special Officer Commissions issued by the Area Director of the United States Bureau of Indian Affairs for the purpose of cooperating with federal law enforcement officials in the maintenance of law and order in Indian Country as that term is defined under 18 U.S.C. § 1161? Concerning your first question, it must be noted that the Indian citizen of the United States holds a unique status in our society different than any other group of common heritage. By virtue of the fact that each Indian tribe in North America was a sovereign nation when it originally began its relationship with the United States government, U.S. v. Kagama, 118 U.S. 375, at 381-382 (1886), the Courts have held that the Indians are "separate people with the power of regulating their internal and social relations." Historically then, in accordance with this status, dealings between the United States and Indian nations resulting in rights or obligations were concluded by treaty. These Indian treaties quite generally provided that the tribes agreed to submit to the overriding sovereignty of the United States, quite similarly to a "protectorate" of the United States. Since the beginning, then, it has been judicially developed by the federal courts and administrative officials that only Congress has plenary authority over Indian affairs to limit, modify or eliminate their powers of self-government. Talton v. Mayes, 163 U.S. 376 (1896). In general, then, state jurisdiction in any matters effecting Indians can be upheld only if one of two conditions have been met: Congress has expressly delegated authority to the state or recognized some state power, or the question involving Indians involves non-Indians to a degree. F. Cohen, Federal Indian Law 504 (U.S. Solic. Dep't. of Int., 3d ed. rev. 1972). Concerning the State of Oklahoma, there has been no such Congressional delegation of authority. To the contrary, federal jurisdiction over Indian lands and affairs was reasserted in the acts of Congress organizing Oklahoma Territory and preparing the Territory for statehood. The Oklahoma Organic Act of 1890, 26 Stat. 81
at Section one, wherein Congress established the boundaries and government of Oklahoma Territory, stated instead: ". . . Provided, that nothing in this act shall be construed to impair any right now pertaining to any Indians or Indian Tribe in said Territory under the laws, agreements, and treaties of the United States, or to impair the rights of person or property pertaining to said Indians, or to affect the authority of the government of the United States to make any regulation or to make any law respecting said Indians, their lands, property or other rights which it would have been competent to make or enact if this Act had not been passed. (May 2, 1890, c. 18226 Stat. 81)." (Emphasis added) Other than this proviso, the only section of the Act dealing with Indian rights and the powers of tribal government is Section 12. Section 12 provides, in part, as follows: "That jurisdiction is hereby conferred upon the district courts in the Territory of Oklahoma over all controversies arising between members or citizens of one tribe or nation of Indians and the members or citizens of other tribes or nations in the Territory of Oklahoma, and any citizen or member of one tribe or nation who may commit any offense or crime in said Territory against the person or property of a citizen or member of another tribe or nation shall be subject to the same punishment in the Territory of Oklahoma he would be if both parties were citizens of the United States; and any person residing in the Territory of Oklahoma, and whom there is Indian blood, shall have the right to invoke the aid of the courts therein for the protection of his person or property, as though he were a citizen of the United States: Provided, that nothing in this act contained shall be so construed as to give jurisdiction to the courts established in said Territory in controversies between Indians of the same tribe, while sustaining their tribal relation." (Emphasis added) Section 12 is unique in that, while it provides access to the federal courts for the resolution of controversies involving members of different Indian tribes, it is not a mandatory requirement and jurisdiction is withheld over all matters involving members of the same tribe, not merely while in the Indian Country, but while sustaining tribal relations. The legislative history of the act supports the proposition that the territorial government was not designed or meant to have any effect on the governing authority of the tribes located within the territory. Congressman Mansur clearly stated the intent of the Act thusly: "I challenge any gentleman on this floor . . I care not who he is — to take anyone of the first 24 sections of this bill and show where it touches a red man at all. I repeat, for I would like to have it understood, that the first 24 sections of this bill do not relate to a red man or to a tribe, do not relate to the Indians in any manner whatever. The first 24 sections relate to white men only, of whom there are 200,000 in that territory now asking for law and order and legislation . . ." "Now, as to every Indian Reservation within the whole limits of the Indian Territory is now organized, we say expressly that those first 24 sections of the Act thus organizing this territorial government shall not apply. Remember, gentlemen, we must say in plain, clear language, that, as to every Indian tribe and as to the land of every Indian tribe, none of these 24 sections which apply to white people shall operate. 21 Cong. Rec. 76 (1890). It should be noted that in 1890, none of the Indian tribes in the Territory had been allotted and were presently under reservation status. The Congressman's remarks indicate that the Act was intended to provide a government for those white persons legally within the area and to leave the reservations completely under the control of the tribes. Further legislative history gleaned from the Congressional debates of the time, evidences that the correct interpretation of Section 12 is an extension to those of Indian blood a non-mandatory right to appeal to the federal courts to protect their persons or property when the dispute involved only members or citizens of different tribes or nations. It is thus analogous to federal diversity jurisdiction taking no power of jurisdiction away from the Indian tribe. The Oklahoma Enabling Act of Congress, Act of June 16, 1906, 34 Stat. at 267-278, set out the requirements placed upon the territories of Oklahoma and Indian Territory for admission into the Union as the State of Oklahoma. Section 1 of the Enabling Act authorized the inhabitants of both territories to adopt a constitution and become the State of Oklahoma provided, . . . ". . . That nothing contained in said constitution shall be construed to limit or impair the rights of persons or property pertaining to the Indians of said Territories (so long as such rights shall remain unextinguished) or to limit or affect the authority of the Government of the United States to make any law or regulation respecting such Indians, their lands, property or other rights by treaties, agreement, law or otherwise, which it would have been competent to make if this Act had never been passed." The third paragraph of Section 3 of the Enabling Act contained a requirement that the proposed Oklahoma Constitution contain a disclaimer clause. The disclaimer clause presently Article I, Section 3 of the Oklahoma Constitution, provides that: "The people inhabiting the State do agree and declare that they forever disclaim all right and title in or to any unappropriated public lands lying within the boundaries thereof, and to all land lying within said limits owned or held by any Indian, tribe, or nation; that until the title to any such public land shall have been extinguished by the United States the same shall be and remain subject to the jurisdiction, disposal, and control of the United States . . ." It appears, then, from the face and the legislative history of the Congressional acts affecting Oklahoma, the Organic Act and the Enabling Act, that there was no intent to extend state jurisdiction to Indians, Indian tribes, or Indian country within the territories upon the attainment of statehood. Further support for this position can be taken from the provisions of a later act of Congress, Public Law No. 83-280,67 Stat. 588 (1953). Under this enactment the Congress gave the states permission to assume criminal and civil jurisdiction over any Indian Country within their borders without consent of the tribe affected in certain circumstances. Title IV of the Civil Rights Act of 1968, 26 U.S.C. § 1321-1326, changed the procedure set out in Public Law 83-280 and required the consent of Indians involved before a state was permitted to assume criminal and civil jurisdiction over Indian Country. See 25 U.S.C. § 1321(a) and 1322(a). Like Section 6, Public Law 83280,25 U.S.C. § 1324, gave states with legal impediments to the assumption of jurisdiction under Title IV, permission to amend their constitutions and statutes to remove any such impediments and provided that the assumption of jurisdiction by such states should not be effective until the required amendments had been made. As previously mentioned, Article I, Section 3 of the Oklahoma Constitution setting out the disclaimer clause constitutes such a legal impediment. See H.R. Rep. No. 848, 83rd Cong. 1st Sess., reprinted in 1953 U.S. Code Cong. Ad. News 2409. Under the provisions of Public Law 83-280, the State of Oklahoma could have unilaterally assumed jurisdiction over any Indian Country within its borders during the period of time between 1853 and 1968 had the Oklahoma Constitution been amended as required. It appears that during this period of time the State of Oklahoma did not assume jurisdiction over Indian Country pursuant to Public Law 83-280. After the enactment of Title IV in 1968, the State of Oklahoma would have been required to amend its constitution and obtain consent of the affected tribes, prior to the legal assumption of state jurisdiction over Indian Country. U.S. v. Littlechief, CR-76-207-D (November 7, 1977). It, therefore, appears that no Congressional act has expressly delegated authority to the State of Oklahoma to assume jurisdiction over crimes committed by Indians against Indians upon territory under the concurrent jurisdiction of the federal and tribal Governments. Congress acted to limit tribal sovereignty over the control of criminal conduct of Indian persons by an Act of Congress on March 3, 1885, popularly known as the Ten Major Crimes Act, 18 U.S.C. § 1151, 1153, and 3242. In these enactments, the United States government asserted exclusively, jurisdiction over the following enumerated major felony crimes when committed by Indians in lands defined as "Indian Country." "Offenses committed within Indian Country. Any Indian who commits against the person or property of another Indian or other person assault with intent to commit rape, incest, assault with intent to kill, assault with a dangerous weapon, arson, burglary, robbery and larceny within the Indian Country, shall be subject to the same laws and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States.18 U.S.C. § 1153." The term "Indian Country" was defined in18 U.S.C. § 1151 as follows: "Except as otherwise provided in 1154 and 1156 of this Title, the term 'Indian Country' as used in this chapter means: a) all land within the limits of any Indian reservation under the jurisdiction of the United States government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof and whether within or without the limits of a state, and c) all Indian allotments, the Indian titles to which have not been extinguished, including rights of way running through the same." (Emphasis added) Therefore, it is clear in regards to the enumerated major felony crimes committed by an Indian against an Indian victim which occurs within the aforementioned lands so defined as "Indian Country," the federal government has preempted the field of criminal prosecution. In the recent U.S. Supreme Court case of U.S. v. Smith John et al., No. 77-836, 46 U.S.L.W. 4806 (June 23, 1978), the high Court concurred with the above principle. Prior to 1890, the geographic area which was later to become the State of Oklahoma was known as Indian Territory. The only governments operating in Indian Territory prior to 1890 were the Indian tribal governments and the federal government. All of Indian Territory was Indian Country, by definition for tribal governmental purposes. On May 2, 1890, Congress established the Territory of Oklahoma as a formally organized United States territory. Therefore, two territories within the geographic area now known as Oklahoma were established. During the 1890 to 1907 pre-statehood period, under the General Allotment Act of 1887, 24 Stat. 388, as amended, and special Allotment Acts relating to the Five Civilized Tribes and the Osage Indians, tribal domains were allotted to individual Indian members with title held in trust for them by the federal government. Rights of alienation of this land were restricted for the supposed protection of the Indians. That land in Oklahoma Territory not so occupied by the General Allotment Act Indians was opened to white settlers and colonized by the land runs between 1889 and 1906. In 1907, the State of Oklahoma was admitted to the Union with a "crazy — patchwork quilt pattern" of Indian trust allotment lands scattered over the lands settled by non-Indians under the unquestioned government of the State of Oklahoma.